# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1647V

| | |
|---|---|
| TRUDEE MENDONCA,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: January 6, 2026 |

*Heather M. Bonnet-Hebert, Feingold Bonnet-Hebert, New Bedford, MA, for Petitioner.*

*Dorian Hurley, U.S. Department of Justice, Washington, DC, for Respondent.*

### **RULING ON ENTITLEMENT**[1]

On November 7, 2022, Trudee Mendonca filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, or in the alternative a caused-in-fact injury, after receiving an influenza ("flu") vaccine on November 7, 2019. Petition at 1, ¶¶ 2, 17-18.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties dispute whether the "severity requirement" (applicable to all Program claims) is met.[3] For the reasons discussed below, I find that Petitioner likely suffered the residual effects of her SIRVA for more than six months, and she has satisfied the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I.     Finding of Fact Regarding Onset and Duration

At issue is whether Petitioner continued to suffer the residual effects of the SIRVA for more than six months. Section 11(c)(1)(D)(i) (statutory six-month severity requirement). (Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii) & (iii)).

### A.     Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25,

---

[3] On March 27, 2024, Respondent filed a Rule 4(c) Report opposing compensation. ECF No. 22. He argues Petitioner "has failed to demonstrate that she suffered the residual effects of her SIRVA for more than six months following her receipt of the flu vaccine." *Id.* at 15. Respondent acknowledges, however, that the remaining requirements of a Table SIRVA are satisfied by the preponderant evidence found in the contemporaneous medical records. *Id.* at 14-15 (citing 42 C.F.R. § 100.3(c)(10) (2017) (the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA).

1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

B.     **Findings of Fact**

I make these fact findings after a complete review of the record, which includes all medical records, affidavits or declarations, and additional evidence filed. Specifically, I note the following:

- Prior to vaccination, Petitioner suffered multiple medical issues including mood disorder, functional dyspepsia, gastritis, hot flashes from menopause, headaches, chronic pain in her neck and back, and issues affecting her *right* shoulder. These conditions caused her to see a variety of medical providers including rheumatologists, orthopedic surgeons, and physical therapists. *See generally,* Exs. 3, 5, 9, 11. Approximately ten years prior to vaccination, she underwent arthroscopic surgery to repair a *right* shoulder rotator cuff tear. Ex. 6 at 1.

- Throughout 2018 and 2019, Petitioner received orthopedic treatment for lower back, neck, and right shoulder pain. Ex. 5 at 13-51, 53-58. Diagnosed with mild degenerative disc disease at the C4-C5 level with central stenosis and cord compressions greater on the left than right and right shoulder bursitis, Petitioner underwent steroid injections, took medication including Gabapentin, used THC daily, and underwent some physical therapy ("PT") which was not effective. *E.g., id.* at 16 (history in May 9, 2019 orthopedic record).

- On November 7, 2019, Petitioner (age 66) received a flu vaccine, administered in her left deltoid, from the Walgreens pharmacy in Riverside, RI. Ex. 8 at 3-5; *see also* Ex. 2 at 1 (initially provided and more cursory vaccine record).

- During an appointment with her primary care physician ("PCP") on November 14, 2019, to follow up on unrelated medical testing results, Petitioner reported that she "got her flu shot at Walgreens 1 week ago and by 8pm that night she was in excruciating pain and that pain has continued with it persisting to this day." Ex. 3 at 4. Exhibiting decreased range of motion ("ROM") upon examination, she stated that she "feels the flu shot caused this frozen shoulder," and planned to contact her orthopedist for further evaluation. *Id.*

- On November 22, 2019, Petitioner visited the orthopedic clinic where she received treatment for her prior conditions (lower back, neck, and *right*

4

shoulder pain) for a new complaint of *left* shoulder pain, rated at ten out of ten, after receiving the flu vaccine two weeks earlier. Ex. 5 at 10. Noting that x-rays revealed severe AC joint osteoarthritis and observing limited ROM, the nurse practitioner treating Petitioner "suspect[ed] subacromial bursitis post flu injection." *Id.* at 12. She administered a corticosteroid injection, provided a PT referral, and instructed Petitioner to follow up in two months. *Id.* at 11-12.

- At her PT evaluation on December 11, 2019, Petitioner again complained of left shoulder pain following receipt of a flu vaccine on November 7, 2019. Ex. 6 at 1. She reported only three days of relief from the corticosteroid injection, pain at a level of six, continued difficulty sleeping, and required cancelation of a planned cruise. Ex. 6 at 1. It was noted that severe osteoarthritis and bone spurs were visible on x-rays. *Id.* Upon examination, she exhibited mild to moderate weakness and limitations in ROM. *Id.* at 1-2.

- On December 13, 2019,[4] Petitioner attended a follow-up appointment with her PCP for treatment of "R hand pain and swelling for the last 6+ months, also pain in many other joints." Ex. 9 at 115. It was noted that Petitioner (a retired dental hygienist) had experienced joint pain for four to five years "and has had had [sic] multiple neck injections and PT for neck and shoulder problems from repetitive motions at work." *Id.* Reporting that she had not been diagnosed with arthritis but wished to see a new rheumatologist (*id.*), she described "episodic joint pain and swelling, . . . brief but severe" (*id.* at 118). Stating that he "[s]uspect[ed] CPPD[5] or calcific tendonitis, though OA[6] is also possible," the PCP instructed Petitioner to continue with her current medication which had resulted in "much improve[ment]." Ex. 9 at 118.

---

[4] On this same day, Petitioner also saw an endocrinologist for a check of stable thyroid nodules with no mention of other conditions, such as her left shoulder pain. Ex. 9 at 112-114.

[5] CPPD stands for calcium pyrophosphate deposition (disease). MEDICAL ABBREVIATIONS at 148 (16th ed. 2020). It also can be abbreviated as CPDD. *Id.* at 146. This disease is "an acute or inflammatory arthropathy caused by deposition of calcium pyrophosphate dihydrate (CPPD) crystals in the joints and characterized by chondrocalcinosis and the presence of the crystals in synovial fluid. . . . Clinically, it may resemble numerous connective tissue diseases, including osteoarthritis, rheumatoid arthritis, and gout, or it may be asymptomatic." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 530 (32th ed. 2012).

[6] OA stands for osteoarthritis. MEDICAL ABBREVIATIONS at 428.

5

- The record from this December 13, 2020 PCP visit also contained information about Petitioner's earlier PCP appointment for "frozen shoulder." Ex. 9 at 115. She recounted "seeing her PCP due to bad shoulder pain; she then saw ortho, who took an x-ray of the [left] shoulder, and told her she has 'severe osteoarthritis with bone spurs.'" *Id.* Petitioner also reported the gradual return of pain following four days of relief from the steroid injection she received and her attempt to perform home exercises which was "limited by pain." *Id.*

- On December 30, 2019, Petitioner had a follow-up appointment with her PCP for unrelated medical issues. Ex. 3 at 2. At this visit, Petitioner stated that her left shoulder pain was feeling "a bit better" and that PT was helping. *Id.*

- Between December 11, 2019, and January 8, 2020, Petitioner attended five PT sessions. Ex. 6 at 1-12. Although she reported some symptoms reduction and greater ability to perform the PT exercises at her third session on December 26, 2019 (*id.* at 6), she recounted feeling the same during the remaining two sessions in January 2020 (*id.* at 8, 11). At her last session on January 8, 2020, she was assessed as having full ROM, but she continued to report "pain 'deep within' her shoulder." *Id.* at 12. Petitioner estimated her pain level at that last PT session as eight out of ten. *Id.* at 11.

- At her next orthopedic visit on January 9, 2020, Petitioner reported quitting PT because she "had been in a lot of pain" (Ex. 5 at 3), describing her current pain[7] as "sharp, penetrating, shooting, stabbing, and burning" (*id.* at 5). Repeating her earlier assessment of "[s]evere AC joint OA noted on imaging and suspect[ed] subacomiai [sic] bursitis post flu injection," the orthopedic nurse practitioner discussed treatment options with Petitioner, instructing her to continue her exercise program and Gabapentin. *Id.* at 7. She also ordered an MRI.

- On January 14, 2020, Petitioner attended a one-year gastroenterology follow-up appointment, complaining of constipation which previously had had been managed with over-the-counter medication. Ex. 9 at 107. She was prescribed medication. *Id.* at 108.

---

[7] When recounting that she quit PT, Petitioner cited a pain level of six out of ten. Ex. 5 at 3. She rated her pain immediately post-vaccination as ten. *Id.* And she appeared to rate her current pain as nine. *Id.* at 5.

6

- On January 15, 2020, Petitioner had an MRI of the left shoulder which showed "[f]ocal tendinopathy of the infraspinatus tendon near the distal myotendinous junction, with surrounding soft tissue inflammation, muscle inflammation, and subacromial deltoid bursitis [but] [n]o cuff tear, no glenohumeral cartilage loss, [and] no labral abnormality." Ex. 7 at 1; Ex. 5 at 52.

- On February 11, 2020,[8] Petitioner presented to the emergency room ("ER") for possible bowel obstruction. Ex. 13 at 11.

- On April 1, 2020, Petitioner participated in a telehealth/audio appointment with her PCP for a three-month-follow-up of her bowel obstruction. Ex. 4 at 23. Reporting that she continued to experience chronic constipation, she shared her dissatisfaction with her experience at the ER. *Id.*

- During this PCP appointment, Petitioner also reported that she continued to experience left shoulder pain that started with her flu vaccination. Ex. 4 at 23. Volunteering that she planned to contact an attorney, Petitioner questioned whether she should obtain a second opinion. *Id.* at 23-24.

- On May 28, 2020, Petitioner participated in a second PCP telehealth/audio appointment, which she requested to discuss several concerns: post-menopausal bleeding, pelvic pain, her bowel movements, and left shoulder pain. Ex. 4 at 20. Regarding her left shoulder pain, Petitioner reported that she "ha[d] contacted a lawyer but everything [wa]s currently on hold due to COVID 19." *Id.*

- On June 2, 2020, Petitioner visited her PCP for treatment of her menopausal symptoms. Ex. 9 at 99-101. It was noted that she was overdue for a bone density scan. *Id.* at 101.

- On June 11, 2020, Petitioner attended another follow-up PCP appointment, this time for treatment of her CPPD arthropathy. Ex. 9 at 93. Reporting "a lot of had pain related to doing things in her garden" about six weeks ago but good relief from voltaren gel. *Id.* The PCP observed that a "[r]eview of the records [was] notable for ongoing shoulder pain [and Petitioner] was considering getting a 2nd opinion." *Id.* The PCP observed that testing in 2019, revealed mild to moderate osteoarthritis of the GH[9] joint and

---

[8] Later this same month on February 28, 2020, Petitioner underwent a mammogram. Ex. 9 at 28.

[9] GH stands for glenohumeral. MEDICAL ABBREVIATIONS at 249.

7

moderate bone spurs and adjusted the medication Petitioner was taking for her right hand and joint pain. *Id.* at 97.

- On June 12, 2020, Petitioner had an appointment for unrelated medical issues. Ex. 9 at 25. Although the record notes Petitioner's osteoarthrosis, there was no discussion of Petitioner's shoulder at this appointment.

- On July 24, 2020, Petitioner underwent a physical evaluation during a telehealth/audio only appointment with her PCP.[10] Ex. 4 at 16. She discussed unrelated medical issues such as her past constipation and routine testing such as a mammogram and bone density evaluation but otherwise had "[n]o other concerns or complaints." *Id.* at 16. Her osteopenia at multiple sites was mentioned in the list of assessments, and the PCP prescribed vitamin D, ordered a bone density test, and instructed Petitioner to follow-up regarding all conditions in six-months to a year. *Id.* at 16-18. In the review of symptoms section on the left side of the record, it was noted that Petitioner denied any joint pain. *Id.* at 18.

- On August 26, 2020, Petitioner had a bone density scan which confirmed her osteopenia diagnosis and revealed significant changes in her spine. Ex. 9 at 23-24.

- On January 26, 2021, Petitioner participated in another physical evaluation during a telehealth/audio only appointment with her PCP. Ex. 4 at 13-15. Regarding her *left* shoulder pain, she stated that she "[wa]s still having shoulder pain s/p flu shot over 1 year ago [and] did not get a flu shot this year." *Id.* at 13. Although an entry of "[p]ost-traumatic osteoarthritis of *right* shoulder" was included in the list of assessments, it is unclear whether this description was correct, or an erroneous entry meant to reference her *left* shoulder condition. *Id.* In either case, the pain was described as "chronic, still painful, but *tolerable at this time*," and no actual treatment was prescribed. *Id.* at 14 (emphasis added).

- Over five months later, on June 4, 2021, Petitioner visited her PCP, complaining of "neck pain, shoulder pain and headache." Ex. 4 at 10. She described pain that began the prior day in her right shoulder – radiating to her neck, was now in her left shoulder and head, and was at a level of ten despite her taking oxycodone and tizanidine. *Id.* Observing that Petitioner "appear[ed] uncomfortable [and] ha[d] pain with any movement of her neck

---

[10] A few days later in July 2020, Petitioner attended a gynecological appointment. Ex. 9 at 84 – 86.

8

and head" (*id.*), the PCP instructed her to go to the ER immediately. *Id.* at 10-11.

- At the ER, Petitioner stated she had "severe right shoulder pain with radiation to her right neck" but denied any trauma to the neck or shoulder. Ex. 13 at 69. An examination revealed right-sided paraspinous muscle spasm, right-sided paraspinal tenderness, and tenderness in the distribution of the right trapezius muscle. *Id.* at 70. X-rays of the right shoulder showed no fraction or dislocation but showed oval shaped area of sclerosis and narrowing of the glenohumeral joint and AC joint (*id.* at 116), and a CT scan revealed normal results (*id.* at 118-123). Petitioner was given morphine which reduced her pain from ten to five, prescribed Flexeril and oxycodone, and advised to return to the ER if her pain continued or reoccurred. *Id.* at 73.

- In a note dated July 9, 2021, Petitioner PCP recounted a telephone call with Petitioner's counsel to discuss Petitioner's left shoulder pain post-flu vaccination. Ex. 4 at 7. Specifically, the PCP noted counsel's request for additional documentation related to Petitioner's January 2021 visit, and a statement being drafted for his signature. *Id.*

- On August 13, 2021, Petitioner visited her PCP for a physical and discussion of a variety of complaints including hot flashes, stress and anxiety, and "chronic aches and pains" for which she sees a rheumatologist and orthopedist. Ex. 4 at 3.

- On September 22, 2021, Petitioner had a follow up PCP appointment. Ex. 9 at 66-71. Reporting that the voltaren gel for her osteoarthritis and medication for CPPD arthropathy "[we]re working well," Petitioner described elbow, wrist, hand, ankle, and knee pain that was currently controlled but seemed to be "getting worse over time." *Id.* at 66. Opining that Petitioner's "episodic joint pain and swelling affecting her R hand" was likely due to her "CPPD or calcific tendonitis, though OA [wa]s also possible," the PCP instructed her to continue using her current gel and medication. *Id.* at 70. He also assessed Petitioner as suffering from muscle spasms. *Id.*

- Petitioner had a telehealth appointment with her PCP on December 15, 2021, to request a prescription refill. Ex. 9 at 63. She reported that she had moved to Florida and was searching for a PCP there. *Id.*

- In her affidavit, Petitioner insisted that she suffered the residual effects of her SIRVA for more than six months and began compiling "a timeline of [her] experience and treatment" after experiencing pain for a year. Ex. 1 at ¶ 4. She provided this timeline, as well as one created by her husband at the end of her affidavit. *See id.* at ¶¶ 4-5; *id.* at 4-7. In her timeline, Petitioner recounted a call with her PCP when the PCP "was unable to suggest any other remedy other than giving the shoulder additional time to heal" and improved movement but continued weakness and an inability to sleep on her left side through December 2020. *Id.* at 4. In his timeline, Petitioner's husband echoed her assertions related to improved movement but difficulties sleeping through December 2020. *Id.* at 6. All three documents discussed Petitioner's difficulties obtaining treatment in 2020, due to the worldwide COVID Pandemic. *Id.* at 2, 4, 6.

### C. Analysis

To satisfy the Vaccine Act's severity requirement in this case, Petitioner must show that she suffered symptoms of her alleged SIRVA beyond May 7, 2020 (assuming a pain onset the same day as the November 7, 2019 vaccination - which the record preponderantly supports). The above medical entries preponderantly suggest Petitioner suffered from pain and limited ROM through at least May 2020, and likely as late as January 2021 – and despite several obvious treatment gaps that unquestionably highlight the overall-mild nature of the injury at issue.

Given that Petitioner experienced improvements in movement, but little to no pain relief, from PT attended through January 2020, it is likely that her symptoms continued thereafter. Although she did not actively pursue further treatment during spring 2020, this failure can be attributed in part to the difficulties she likely encountered obtaining an in-person appointment during the height of the COVID Pandemic.[11] And she continued to mention her left shoulder pain during telephonic appointments in April and May 2020. Ex. 4 at 23, 20 (chronologic order). Furthermore, Petitioner affirmatively stated that she was experiencing pain during the early April 2020 encounter. *Id.* at 20. I find these entries are sufficient to show symptom duration through at least six-months (May 7, 2020).

It is also likely that Petitioner continued to experience some left shoulder symptoms through January 2021, but the evidence supporting an injury persisting into this timeframe is more equivocal. The record shows Petitioner suffered multiple unrelated conditions causing pain in other locations for which she sought treatment during the remainder of

---

[11] *See* https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 6, 2025) (For a timeline related to the pandemic and availability of COVID vaccines).

2020. By contrast, any ongoing left shoulder symptoms were not severe enough to elicit further treatment. And although Petitioner reported continued left shoulder pain during a January 2021 PCP appointment, this occurred after visits related to pain in multiple locations from her osteoarthritis and CPPD. *E.g.,* Ex. 9 at 93-97. And this same record discusses right shoulder pain as well. Ex. 4 at 13-14.

At bottom, however, evidence for the required six-month sequela need only barely cross the "severity finish line." A petitioner's pain need not *also* be severe or constant for a *longer* timeframe. *See Sullivan v. Sec'y of Health & Hum. Servs.* No. 21-2341V, 2024 WL 2290012, at *7 (Fed. Cl. Spec. Mstr. Apr. 16, 2024). The mildness and possibly intermittent nature of a petitioner's pain are issues highly relevant to damages, and suggest any award in this case for pain and suffering should be modest, but do not prevent me from finding that the basic requirement of six months severity is met. *See Alsip v. Sec'y of Health & Hum. Servs.,* No. 21-1815V, 2023 WL 3060573, at *6 (Fed. Cl. Spec. Mstr. Arp. 24, 2023).

Accordingly, I find there is preponderant evidence to establish Petitioner suffered the residual effects of her alleged SIRVA for more than six months.

## II.     Additional Requirements for Entitlement

### A.     Legal Standards

In addition to requirements concerning the vaccination received, the duration of petitioner's injury (discussed above in Section II), and the lack of other award or settlement,[12] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

---

[12] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B.    Analysis

Respondent has stated no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu vaccine. There is evidence of prior *right* shoulder pain, but not *left* shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. Ex. 6 at 1; *see* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And Petitioner experienced pain within 48 hours of vaccination and exhibited pain and limitations in ROM

solely in her left, injured shoulder. *E.g.,* Ex. 3 at 4; *see* 42 C.F.R. § 100.3(c)(10)(ii) & (iii) (second and third QAI criteria).

As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of her SIRVA for more than six months. *See* Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the flu vaccine administered at a Walgreens pharmacy in Riverside, Rhode Island. Exhibit 2 at 1-2; Ex. 8 at 3-5; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). And there is no evidence that Petitioner has collected a civil award for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### III.     Appropriate Amount of Compensation

Although I have found Petitioner entitled to compensation, I do not expect the amount awarded for Petitioner's past pain and suffering to be great. Despite the COVID Pandemic, she pursued treatment for other conditions throughout 2020 – but not the SIRVA at issue. And Petitioner suffered multiple co-morbidities that would account for much of the pain she experienced during this time. Nor do I find on this record that it is likely Petitioner's SIRVA persisted for much longer than the bare six-month of sequelae minimum. Any damages demand (including pain and suffering) must take these findings into account.

### Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA and the Vaccine Act's severity requirement needed for both Table and non-Table claims. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
